## Columbia Life Ins. Co. v. Tousey

(Decided February 25, 1913.)

### Appeal from Breckinridge Circuit Court.

1.  Pleading—Traverse—Sufficiency of.—Affirmative matter of a reply, in effect an affirmative traverse of a defense set up in answer, needs not be controverted.

2.  Insurance, Life—Actions on Policy—Burden of Proof—Question for Jury.—Where it is admitted, that the application for insurance was accepted, the premium paid, and the policy issued and delivered to the applicant, the burden is upon the insurance company to establish its defense; and where the evidence on the issue presented is conflicting, the question is for the jury.

3.  Insurance, Life—Avoidance of Policy for Misrepresentation or Fraud—Matters Relating to Person Insured—Habits—Words and Phrases.—The word "practice," with reference to intoxicants, when used in an application for insurance means "custom," "habit," and if the applicant's use of intoxicants has not been so frequent as that he can be said to have acquired the habit of using intoxi_cants, a jury would be warranted in finding that his answer in the negative to a question as to his practice in the use of intoxicants to be true.

4.  Insurance, Life—Health and Physical Condition of Applicant.—In the absence of any fact, from which it could be inferred that applicant for insurance knew or had reason to believe that he was suffering from any disease at the time of the application, the con-

tention that his answer that "I am in good health" is untrue must fail.

5. Insurance, Life.—The untruth of an answer that applicant had not been treated for inebriety is not shown by evidence that he had taken the Keeley treatment, in the absence of proof of what the treatment was taken for.

6. Insurance, Life—Action on Policies—Weight and Sufficiency of Evidence.—Evidence held to support the verdict of the jury in favor of plaintiff.

ALLEN R. KINCHELOE, HARRY T. KLEIN, C. B. MATTHEWS, for appellant.

J. R. SKILLMAN, BEN D. RINGO, for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

On January 28, 1910, Thomas C. Tousey applied for insurance on his life, in the sum of $1,000.00, by written application to the Columbia Life Insurance Company, of Cincinnati, Ohio. On February 9, 1910, a policy, payable to his wife, Fannie K. Tousey, was issued and delivered to him. He died on December 2nd, following. Proofs of claim were made out and submitted to the company. The company declined to pay and, on September 13, 1911, suit on the policy was filed in the Breckinridge circuit court. The company answered, admitting the issual of the policy and the payment of the premium, but sought to avoid liability upon the ground that the applicant, in his medical examination, had made certain misrepresentations, which were material to the risk, and by reason of which the company was absolved from liability. The beneficiary, the plaintiff, joined issue with the defendant on the truth of the statements relied upon to defeat the collection of the policy; and, upon this issue, the case went to trial before a jury, with the result that plaintiff recovered a verdict for the amount sued for. The defendant company appeals, and seeks a reversal upon three grounds: First, it is insisted that the verdict is flagrantly against the evidence; second, that the court misinstructed the jury; and third, the court erred in not taking the case from the jury, on motion of both plaintiff and defendant for a peremptory instruction.

Disposing of these questions in their inverse order, the record shows that, at the conclusion of the evidence, the appellant moved for a peremptory instruction, based upon the idea that the overwhelming weight of the evi-

dence showed that two, at least, of the answers, alleged
to be false and fraudulent, were proven to be such and
material to the risk, and that on this state of facts ap-
pellee could not recover.  Appellee moved for a peremp-
tory instruction, upon the idea that she was entitled
to a judgment on the pleadings.  The trial judge over-
ruled both motions.  It is insisted by counsel for appel-
lant that, in this, he erred; and authorities from sev-
eral states are cited in support of this contention.  The
motion of appellee should have been sustained if, as
contended, she was entitled to a judgment on the plead-
ings, but the ground relied upon in this particular, is not
tenable.  In appellant's answer it is pleaded that these
answers to certain questions were false and were fraud-
ulently made by the applicant, and that this fact was
known by the applicant but unknown to it.  Appellee,
in her reply, after alleging that the answers were true,
pleaded affirmatively that, if they were false, they were
known to be such by the company, through its agent
who took the application.  As the company, in its an-
swer, had alleged that the answers, and each of them,
were false, this affirmative matter in the reply, and which
was not traversed, was but an affirmative traverse of the
matter set up in the answer; and the issue having been
already joined, the court properly held that the plain-
tiff was not entitled to a peremptory instruction on this
ground.  It is admitted that the application was accepted,
the premium paid, and the policy issued and delivered
to the applicant.  Upon this showing, unless there was
some evidence introduced by appellant tending to es-
tablish its defense, a peremptory should have gone for
appellee; but, inasmuch as the evidence is conflicting
on the issue raised by the answer, the trial court proper-
ly held that the case was one for the jury.  Of course,
if all of the evidence introduced showed that the an-
swers to the questions propounded to the applicant,
which were relied upon to defeat a recovery were, in
fact, false and known to the applicant to be false, appel-
lant would have been entitled to a peremptory instruc-
tion; but, as stated, the evidence upon this point is con-
flicting, and, under the well established rule of practice,
if there is any evidence tending to support the cause of
complaint or the defense, the trial court should submit
the case to the jury.  This rule is well settled in this
state, and needs no citation of authority.  With this dis-

position of the contention that the court erred in not taking the case from the jury, we pass to a consideration of the instructions.

The issue is a narrow one and, in instructing the jury; the court followed the instructions approved by this court in National Protective Legion v. Allphin, 141 Ky., 777 and Metropolitan Life Insurance Co. v. Ford, 126 Ky., 49, where the identical questions, here raised, were involved, and we are of opinion that these instructions fairly and fully presented the issue.

The remaining question, viz: that the verdict is flagrantly against the evidence, is the serious one in the case and that which is most relied upon by counsel for a reversal. The questions asked, the answers to which, it is alleged, were false and fraudulent are:

1. "What is your practice as regards the use of spirits, wines, malt liquors, or other alcoholic beverage? A. Kind, nothing. Amount, none. How often, never. 2. Have you ever drunk to intoxication during the five years last past? If so, how many times? A. No. 3. Have you ever taken any special treatment for inebriety? A. No."

These questions and answers appear in the medical examination. At the conclusion thereof is the following clause: "I hereby declare that I have reviewed and understand all of the above questions and answers thereto, and they are hereby made a part of my application for insurance in the Columbia Life Insurance Company, and that said answers and each of them as written are full, complete and true." In the application, there appears this question, "Are you now in good health? A. Yes." and the following clause: "I hereby agree for myself or for any person who may have or claim any interest in any policy which may be issued upon this application, as follows: 1. That all the foregoing statements and answers and all those that I make to the company's medical examiner, in part II of this application, are full, complete and true, and are offered to the Company as a consideration for the policy, which I hereby agree to accept."

While counsel for appellant insist, with great earnestness, that all of the foregoing answers were untrue, and known to be untrue by the applicant, at the time they were made, particular stress is laid upon the answers to questions 1. and 3., made to the medical examiner.

As to the answer to question one, six or eight witnesses testify for appellant that, on as many as one—some of the witnesses say two, occasions, covering a period of from one to eight years before the applicant's death, they had seen or heard of his taking a drink, or two drinks, or an occasional toddy. Two witnesses testify that, on one occasion some four or five years before the applicant's decease, when he was returning from a Confederate reunion in the City of Louisville, they had seen him in an intoxicated condition. One witness testifies that he saw him drink a bottle of beer. The effect of all this is that the applicant occasionally took a toddy or a drink of whiskey, and, on one occasion, is shown to have drunk a bottle of beer; on one other occasion, according to the testimony of two witnesses, he was in an intoxicated condition, though neither of them saw him drink anything. They do not testify as to the facts upon which they based their conclusion that he was intoxicated, but presumably it was from his actions. Question one is, "What is your practice as regards the use of spirits, wines, malt liquors, or other intoxicating beverages?" None of the answers given is a direct answer to the question asked. If it was intended by the answer, following the word amount, "none" to indicate that the applicant was a total abstainer, this answer might be regarded as responsive; or, if the answer "never" following the question, "How often," is to be regarded as a statement by the applicant that he never took a drink of any alcoholic beverage, then this answer might be regarded as responsive; and so likewise, if it was intended by the answer "nothing," following the word "kind," to convey the idea that the applicant had never used any alcoholic beverage at all, to any extent, then this answer might be regarded as responsive. A consideration of the form, in which the applicant was required to answer these questions, shows that the question was so asked as to render a direct answer practically impossible by one who had ever indulged in the use of alcoholic beverages in the slightest degree. Webster, in his New International Dictionary, defines the word "practice" when used as a noun, as follows:

"1. Action; performance; operation; also, action; deed; proceeding.

"2. Actual performance or application of knowl-

edge; distinguished from theory, profession, etc., esp.
such actual performance or application habitually en-
gaged in; often repeated or customary action; usage,
habit, custom; as the practice of rising early or working
hard."

The word "practice," as it is used in this applica-
tion, was evidently used in the sense of custom, habit;
and, as this definition is one of the proper definitions of
the word, and indeed, is the usually accepted sense in
which the word is used, we can best determine from the
evidence of these various witnesses, as to whether or not
the answers made by the applicant, in the three-fold form
in which he was required to answer, were or not untrue.
Substituting the word "habit" or "custom" for the
word "practice," the question reads, "What is your cus-
tom as regards the use of spirits, etc?" Were the
answers made to this question false? The applicant's
attention was directed to his custom, or habit, in the use
of liquor, and, unless he felt that he had been addicted
to the use of alcoholic liquors to such an extent that it
might be said that he had acquired a habit or custom,
in their use, he was justified in answering as he did;
for, the question being framed as it was, he was only
required to speak with reference to his custom, or habit,
in their use, and if he had acquired no such custom,
his answer was literally true. Most of the witnesses
testify to have seen him take but one drink, in a period
of their intimate acquaintance with him covering several
years. Two or three witnesses state that they saw him
take two, and perhaps three drinks in this time. Would
such acts on his part be sufficient to establish a custom?
May a custom be established by occasional acts, or must
they be indulged in, with such degree of frequency, that
they can be said to have become fixed? For example,
if a man rises early two mornings in the year and late
363, it could hardly be said, with accuracy, that he had
acquired a custom of rising early; or, if, during the year,
he would rise early as often as fifteen or twenty times
and late the remaining mornings of the year, it could
not be said that he had acquired the custom of rising
early. If asked what his custom for early rising was,
he could truthfully say that he did not have the habit
of early rising. Adopting the rule of placing that con-
struction upon the use of words, in an application for
insurance, most favorable to the insured, the word "prac-

tice'' must be construed as meaning custom, habit; and we are of opinion that, when applicant answered that he had acquired no habit or custom in the use of alcoholic beverages of any kind, the jury was justified in finding that his answer, under the evidence in this case, was literally true.

When this evidence is critically analyzed, it is apparent that, if the applicant had stated in the application that he took as many as four or five drinks in the course of a year, no insurance company would have rejected the risk on this ground. There is no evidence in the record showing that, on this state of fact, the appellant company would have rejected the risk; or that evidence of an indulgence in intoxicants, to the degree shown in this case, would have been sufficient to have caused the company to reject the risk. There are several witnesses of unimpeachable character, from whose testimony it is apparent that, during a life of over twenty or thirty years, the applicant was known to be sober, industrious, and a hard working man, with regular habits.

There is some evidence to the effect that, some fifteen or twenty years prior to the date of the application for this policy, he took a treatment known as the Keeley treatment. There is no evidence, save the affidavit filed by counsel as to what an absent witness would testify to, showing that the applicant had, prior to the date when he took this treatment, been addicted to the excessive use of liquor of any character. He may have taken the treatment for the drug, or some other habit, and, in the absence of a showing that the treatment was taken for inebriety, the jury would not be warranted in holding that it was taken for this purpose. The overwhelming weight of the evidence is to the effect that the applicant never was, at any time in his life, an inebriate, even though it be conceded that the two witnesses, who testified that they saw him intoxicated on one occasion, are correct in their diagnosis of his case. Such evidence is not sufficient to establish the charge of inebriety, or to show that ten or fifteen years prior thereto the applicant was an inebriate. On the contrary, the evidence of his employer, and that of others with whom he was associated daily at that time, shows conclusively that, if he was addicted to the use of intoxicating liquors to any extent whatever, they did not know it; and cer-

tainly, if he was not using alcohol to such an extent that it could be discovered by those who were associated with him daily, he was not indulgent to excess. There is really less of merit in this defense, than in the other.

It is next insisted that the answer in the application, "I am in good health," was, and known to him to be, untrue. The application was made, as stated, on January 28, 1910. He died of chronic nephritis in December, 1910. Dr. A. A. Simons testifies that he was called to treat him about the middle of April, 1910, and found him to be suffering with Bright's disease, and he was of opinion that, inasmuch as, at that time, it was in an acute stage, it had existed for some years and did exist, at the time the application was made. Dr. R. L. Lightfoot, the physician who made the medical examination for the company, testifies that he subjected the applicant's urine to the usual and customary tests, at the time the application was made, and that he found no evidence of Bright's desease. There is not an iota of evidence in the record that the applicant ever knew, or had any reason to believe, prior to the time when Dr. Simons waited upon him in April, that he had anything the matter with him. He attended to the duties of his office daily, worked from early in the morning until late in the evening, and even when Dr. Simons was treating him, he evidently did not regard the trouble as serious, for he continued in the discharge of his duties without interruption, until along early in October before his death. As stated in National Protective Legion v. Allphin, 141 Ky., 777, a defense must be based upon something more than theory. The burden of showing that his answer, "I am in good health," is not true, is upon the company. The applicant, in response to the question, was giving his opinion, and, in order to make out its case upon this point, it was incumbent upon the company to show that there were facts within the knowledge of the applicant, at that time, which made it known to him that this answer was not true, such as, that he had been treated by some physician and that physician had told him that this was the trouble, with which he was suffering; or, that he had been rejected by other insurance companies because, upon examination, it was found that he was suffering with Bright's disease. But, in the absence of any showing of any fact, from which it could be inferred that the applicant knew, or had reason to believe that he had

Bright's disease, or any disease, at the time the application was made, the contention that this answer was not true must fail.

The only remaining question which, it is alleged, the applicant made an untrue answer to, is: "Have you ever drunk to intoxication, during the five years last past?" As stated, two witnesses testify that they had seen the applicant intoxicated upon one occasion, and one witness testifies that on perhaps one occasion he saw the applicant when he was intoxicated. The extent of the intoxication is not shown nor does he fix the time within the limit prescribed by the answer. The word intoxication is so broad in its significance that, as stated in National Council of Knights and Ladies of Security v. Wilson, Guardian, 147 Ky., 293, what one would determine to be a state of intoxication would be regarded by another, as duly sober; and, inasmuch as the applicant was, at no time, shown to have been unable to care for himself or to go about his business, it cannot be said, even if it be conceded that all the witnesses say was true, that the answer made to this question was either false or fraudulent.

Upon a careful examination of the entire record, we are of opinion that appellant utterly failed to establish any habit or custom whatever on the part of the applicant, in the use of intoxicants; and while the evidence does show that he took a treatment known as the Keeley treatment, it fails to show that it was taken for inebriety; and there is no evidence whatever to support the charge that, at the time the application was made the applicant was not in good health.

Judgment affirmed.